UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANE K.K. DOE,

                    Plaintiff,

v.

THE GRAND COMPANY, LLC,
ZAHER MANAGEMENT COMPANY,
LLC, ZAHER INVESTMENT GROUP,
LLC, LIONS GATE
DEVELOPMENTS, LLC, RAJI
ZAHER, JOSEPH ZAHER, & RABI
ZAHER,

                    Defendants.

_____/

Case No. 18-cv-13123

Paul D. Borman
United States District Judge

## OPINION & ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 42)

## I.    INTRODUCTION

In this case, Plaintiff Jane K.K. Doe,[1] a nineteen-year-old college student home for the summer, found herself working for the family business of one of her parents' gym acquaintances, Defendant Raji "RJ" Zaher. In the course of Doe's summer working the front desk at The Grand, an apartment complex that the Zahers owned and managed through a complex web of LLCs, she alleges that she was

_____

[1] Plaintiff is proceeding under a pseudonym to protect her name from public disclosure, and so will be referred to as Jane Doe throughout. (*See* ECF No. 4.)

sexually harassed. (*See generally*, ECF No. 4, Amended Complaint, PgID 40–61.) Specifically, she alleges that RJ and his brother, Defendant Rabi Zaher, subjected her to inappropriate and sexual comments, and that on two separate occasions, RJ pressured her into going to a strip club with him on her lunch break, where RJ and a dancer at the club removed her clothing and touched her in an unwelcome and sexual manner. (*Id.*) Based on these experiences, she filed this suit against RJ, Rabi, their father Joseph Zaher, Doe's supervisor and the apparent head of the family business, and four of the Zaher family's LLCs—The Grand Company, LLC; Zaher Management Company, LLC; Zaher Investment Group, LLC; and Lions Gate Developments, LLC. (*Id.*)

Doe brings one claim of harassment and hostile work environment against all of the defendants under Title VII of the Civil Rights Act of 1964, as well as a parallel sexual harassment and hostile work environment discrimination claim under the Michigan Elliot-Larsen Civil Rights Act (ELCRA) against all the defendants, one claim of negligent supervision and one claim of negligent failure to train against The Grand Company, LLC and Zaher Management Company, LLC, one claim of assault and battery and one claim of invasion of privacy against RJ, and one claim of intentional infliction of emotional distress against The Grand Company, LLC, Zaher

Management Company, LLC and RJ.[2] (*Id.*) Defendants have collectively filed a Motion for Partial Summary Judgment, seeking to dismiss all of Plaintiff's claims except for her assault and battery, invasion of privacy, and intentional infliction of emotional distress claims against RJ. (ECF No. 42.)

For the reasons detailed below, the Court grants summary judgment on Plaintiff's Title VII claim against all defendants (Count I), on Plaintiff's negligent supervision, negligent failure to train and intentional infliction of emotional distress claims against Zaher Management and The Grand Company (Counts V, VI, and IX in part), and on Plaintiff's ECLRA claim against Zaher Investment Group, LLC and Lions Gate Development, LLC (Count II in part). The Court denies Defendants' Motion for Summary Judgment on Plaintiff's ELCRA claim against RJ, Rabi, Joseph, Zaher Management, and The Grand Company (Count II in part). Plaintiff's assault and battery, invasion of privacy, and intentional infliction of emotional distress charges against RJ (Counts VII, VIII, & IX in part) were not at issue in the motion and are unaffected by this Opinion and Order.

Although the remaining claims are all matters of Michigan state law, the Court exercises supplemental jurisdiction on these claims because this Court is well versed

---

[2] Plaintiff's Amended Complaint (ECF No. 4) also listed counts of "vicarious liability" and "express/implied agency," but she voluntarily dismissed those claims in her Response (ECF No. 56.)

in the complex facts of this case, which has proceeded to an advanced stage of litigation. *See* 28 U.S.C. § 1367(c).

## II. FACTS

Because this is a Motion for Summary Judgment, the following facts are recounted in the light most favorable to the non-moving party—here, Plaintiff Jane Doe. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

### A. The Zaher Businesses

Defendant Joseph Zaher and his sons, RJ and Rabi, are in the property development business. They operate through several different LLCs that Joseph, for the most part, owns. (*See, e.g.*, ECF No. 53-7, Joseph Dep., PgID 957–63.) Some of these LLCs are used solely for the purpose of holding the title to the properties that they are developing. One of Joseph's businesses, Zaher Holding Group, LLC, holds title to several lots in residential areas, at least two of which have homes being built upon on them. (*Id.* at PgID 956–57.) Another of Joseph's companies, Zaher-Davison/Irish LLC, holds four condominium units in a subdivision called Lions Gate. (*Id.* at PgID 960; *see also* ECF No. 53-19, Zaher-Davison LLC Docs., PgID 1230–32.) Rabi Zaher lives in one of the units while the other three are rented out. (ECF No. 53-7, Joseph Dep., PgID 960.) Finally, The Grand Company, LLC holds title to The Grand, a housing and apartment complex containing 102 rental units. (*Id.* at PgID 958; *see also* ECF No. 53-20, The Grand Co. LLC Docs, PgID 1235–41.)

According to the Zahers, The Grand Company, LLC and Zaher Holding Group, LLC simply exist to hold title to the properties—The Grand Company does not even have a checking account. (ECF No. 53-6, RJ Dep., PgID 888.) The Grand Company is a defendant.[3]

The Zahers manage their rental units at The Grand and in the Lions Gate development through Zaher Management Company, LLC. (*Id.* at PgID 961; *see e.g.*, ECF No. 53-12, Rabi Dep., PgID 1126–27 (describing being called to several properties in his capacity as the maintenance man for Zaher Management).) Unlike the other LLCs discussed so far, Joseph is not listed as the resident agent of Zaher Management, instead, it is organized under the name of his wife, Odette. (ECF No. 53-17, Zaher Management LLC Docs., PgID 1219–21; *see also* ECF No. 53-7, Joseph Dep., PgID 961 ("[I]t's in the name—my wife's name on the corporation.").) Joseph, however, signed Zaher Management's annual statements in at least 2016, 2017, and 2018, as either the owner or the president. (ECF No. 53-17, Zaher Management LLC Docs., PgID 1222–24.) RJ identified Joseph as the owner of Zaher Management and Rabi testified that his mother never really performed substantive work for Zaher Management. (ECF No. 53-6, RJ Dep., PgID 887–88; ECF No. 53-12, Rabi Dep., PgID 1123–24.) So, despite the fact that the LLC is

---

[3] Another LLC, Zaher Investment Group, LLC is also named as a defendant, but there is no mention of it in in any of the evidence provided by the parties, so it is unclear what role it played in the Zaher family business.

technically in Odette's name, Joseph, who handles much of the day-to-day work of Zaher Management, is the de facto owner of Zaher Management. (*See* ECF No. 53-6, RJ Dep., PgID 893–99 (RJ describing Joseph directing the operation of Zaher Management).) Zaher Management, which was the entity that officially employed Doe, is a defendant in this case. (ECF No. 53-7, Joseph Dep., PgID 977.)

RJ and Rabi each own or have owned their own LLCs, which have also been engaged in real estate development in connection with their father's companies. RJ had a company called Lions Gate Development, LLC. (ECF No. 53-6, RJ Dep., PgID 882.) RJ, through Lions Gate Development, LLC, partnered with his father, Joseph, to purchase over hundred acres of empty property and develop it into the Lions Gate subdivision. (*Id.*) He focused on building the "apartment side" of the development, while Joseph, through one of his various LLCs, built the "condominium side" of Lions Gate. (*Id.*) Lions Gate Development, LLC built 200 apartment units, but then RJ lost them through foreclosure sometime between 2011 and 2013. (*Id.* at PgID 883.) RJ has not engaged in any business through Lions Gate Development, LLC since the foreclosure, and has not, in fact, been formally employed or held any property in his own name since that time. (*Id.* at 884–86.)

Joseph still owns the four condominium units that he built in Lions Gate through Zaher-Davison/Irish, LLC. (ECF No. 53-7, Joseph Dep., PgID 960.) He also, through Zaher-Davison/Irish, owns additional land in the Lions Gate

subdivision on which additional condos are being built. (ECF No. 53-12, Rabi Dep., PgID 1111, 1120.) Lions Gate Development, LLC is a defendant in this case, though Plaintiff has indicated that she intended to sue the entity that holds the condominiums in the Lions Gate subdivision, which is Zaher-Davison/Irish, LLC. (*See* ECF No. 56, Response, PgID 1269 n. 10.) Plaintiff has requested "the right to amend" in order to substitute Zaher-Davison/Irish for Lions Gate Development. (*Id.*)[4]

Rabi, who is formally employed by Zaher Management, owns his own LLC, called West Coast Development. (ECF No. 53-12, Rabi Dep., PgID 1118–19.) Rabi, through West Coast, is building condominiums in the Lions Gate subdivision. (*Id.* at PgID 1120–21.) Joseph provided Rabi with a personal loan to fund construction of the first condominium that West Coast built in Lions Gate and Joseph continues to own the Lions Gate property that West Coast is developing. (*Id.* at PgID 1111, 1120.) West Coast is not a defendant.

Despite the technical separation of the various parts of the Zaher family real estate development and management business, Joseph, RJ and Rabi all live off of Zaher Management income. Rabi lives in one of the condominiums at Lions Gate rent-free, he drives a truck leased by Zaher Management, he goes on family vacations paid for by Zaher Management, and uses a Zaher Management credit card

---

[4] Plaintiff is free to file a separate motion requesting to amend her Complaint.

for meals, travel, luggage, and work clothing. (ECF No. 53-12, Rabi Dep., PgID 1122–23.) Joseph pays for everything for RJ, who is technically unemployed. (ECF No. 53-6, RJ Dep., PgID 885.) Joseph pays for RJ's credit card, on which he spends $2,000-3,000 a month, pays private school tuition for RJ's children, pays for RJ and his wife to lease a 2017 Cadillac Escalade and a 2016 Mercedes respectively, and has furnished RJ and his family with a 6,000-7,000 square foot home. (*Id.* at PgID 885–86, 889.) Zaher Management is also paying the legal bills for all of the defendants. (ECF No. 53-7, Joseph Dep., PgID 971–72.)

Rabi is formally on Zaher Management's payroll for his job in performing maintenance on all of the properties Zaher Management manages. (*See id*. at PgID 965.) RJ claims to be unemployed. (*See, e.g.*, *id.* at PgID 963, 972–73.) RJ, however, spends a great deal of time "helping" Joseph run Zaher Management. (*See, e.g.*, ECF No. 53–6, RJ Dep., PgID 892 ("I took the liberty of answering the phones for [Joseph] until he found somebody. And I also showed some people condos when he was unable to.").) RJ testified that he goes to the Zaher Management office, located in The Grand (the building), almost every day for an hour or so. (*Id.* at PgID 889.) RJ has one of the three keys to the Zaher Management office. (*Id.* at PgID 902.) RJ has a personal office within the Zaher Management office space. (ECF No. 53-2, Doe Dep., PgID 777.) During the time Doe was employed with Zaher Management, RJ kept a business phone on his person so that he could handle calls when no one

was in the office. (ECF No. 53–6, RJ Dep., PgID 895.) He performed the duties that Doe was assigned before she was hired and after she left (*id.* at PgID 903) and was so involved in the business that Doe believed him to be a co-owner. (ECF No. 53-2, Doe Dep., PgID 776.)

Due to the intricacies of the Zaher family business, it is difficult to determine who, other than Rabi and RJ, works, or has worked, for Zaher Management or any of the other family LLCs. Rabi testified that his company, West Coast, does not have employees because Rabi subcontracts all the work he does not do himself. (ECF No. 53-12, Rabi Dep., PgID 1112, 1115–16.) RJ's company, Lions Gate Development, has not employed anyone since it ceased operations in 2013. (ECF No. 53-6, RJ Dep., PgID 884.) Joseph referred to using an engineer, "Mr. Freeman," and architects in his current building projects, though his relationship with Mr. Freeman and the undisclosed number of architects and exactly which projects they were working on is unclear from his testimony. (ECF No. 53-7, Joseph's Dep., PgID 973.)

For Zaher Management itself, Joseph attested that the only people on its payroll during the time that Doe worked there were Joseph, Rabi, Rosan (RJ's wife), and Doe. (ECF No. 57-1, Joseph Aff., PgID 1296.) According to Joseph, any other work that Zaher Management needed performed was handled by independent companies with which Zaher Management had contracts. (*Id.* at PgID 1296–97.) Rabi testified that his brother, his dad, and his mom were the only people who he

knew worked at Zaher Management before Doe, though he clarified that his mom only came to the office "rarely" to give them food and say hi. (ECF No. 53-12, Rabi Dep., PgID 1123.) In RJ's deposition, he referred once to a man named Tony, who he called "our painter," and once to a man named Brian, who he described as the "maintenance guy." (ECF No. 53-6, RJ Dep., PgID 898–99.) According to Joseph, Brian "is a 1099 contractor who mainly plows the snow," and Tony is the owner of Trademark Painting, the contractor Zaher Management uses for painting. (ECF No. 57-1, Joseph Aff., PgID 1296–97.)

Doe declared that the Zahers paid two women to do janitorial work, and that they "directed when and where they worked . . ., gave them tasks and instructions . . ., [and] furnished the cleaning supplies and equipment that they used." (ECF No. 53-18, Doe Aff., PgID 1227.) She further declared that the Zahers had a four person maintenance team, to whom they gave tasks and instructions, directed when and where they worked, and paid for their supplies and equipment. (*Id.* at PgID 1227–28.) Finally, Doe declared that the woman who was set to replace Doe when she returned to college "frequently came into the office to discuss the fact that she would assume my [Doe's] job." (*Id.* at PgID 1228.)

After Doe left Zaher Management, an unnamed woman assumed Doe's role, though she lasted fewer than 90 days in the position. (ECF No. 53-7, Joseph Dep., PgID 978.) She may have been replaced by another unidentified person because Rabi

testified, "[t]here's been a couple people in there [Doe's former position]." (ECF No. 53-12, Rabi Dep., PgID 1127.) Eventually, in December of 2018 or January of 2019, Joseph hired a man named Raymond to do Doe's former tasks, and Joseph also hired a woman named Dawn to do accounting. (*Id.* at PgID 1124; ECF No. 53-7, Joseph Dep., PgID 978–79; ECF No. 53-6, RJ Dep., PgID 926.) Raymond and Dawn still work for Zaher Management, in offices of Zaher Management inside The Grand (the building). (ECF No. 53-7, Joseph Dep., PgID 962.)

## B.     Doe's Summer Employment Experience

In the early summer of 2018, Doe had returned home from college and was struggling to find a job. (ECF No. 53-2, Doe Dep., PgID 774–76.) Doe's parents were talking to a friend at their gym about her job search when RJ Zaher, a fellow gym-member, "inserted himself into the conversation" and said that Doe should come work for him. (ECF No. 53-4, Doe's Father Dep., PgID 846.) RJ gave Doe's parents his phone number and told her to call him. (*Id.*) Doe's parents passed the number on to her, Doe called RJ and two hours later she met him at the offices of The Grand (the building) for her interview. (ECF No. 53-2, Doe Dep., PgID 776.) After a short interview, RJ hired Doe, asked if she could start that very day, and introduced her to Joseph and to one of the maintenance guys. (*Id.* at PgID 776, 779.)

Doe's job involved showing units of The Grand to potential renters, answering the phones, filing paperwork, writing and revising leases, coordinating with

maintenance, streamlining resolution of tenant complaints, and other office assistance. (*Id.* at PgID 776.) She was asked to be there, at the front desk of The Grand, from nine to five on weekdays. (*Id.* at PgID 777.) Doe and her family were all under the impression that she was working for a business owned by either RJ alone, or owned by RJ, Joseph, and Rabi. (*Id.* at PgID 777; ECF No. 53-4, Doe's Father Dep., PgID 846.)

Joseph, Rabi, and RJ were all often present in the office, and they all helped train Doe on her duties. Joseph was in the office every day and was, officially, Doe's direct supervisor. (ECF No. 53-2, Doe Dep., PgID 777; ECF No. 53-6, RJ Dep., PgID 893.) Rabi trained Doe on the computer program they used. (ECF No. 53-7, Joseph Dep., PgID 979.) All three of them gave her instructions and tips on showing units to interested renters and speaking on the phone with customers. (*Id.*; ECF No. 53-6, RJ Dep., PgID 894; ECF No. 53-2, Doe Dep., PgID 776–77.) RJ and Joseph gave her most of her day-to-day tasks and instructions. (ECF No. 53-6, RJ Dep., PgID 893, 896–99; ECF No. 53-2, Doe Dep., PgID 777; *see also* ECF No. 53-8, Texts Between RJ and Doe, PgID 1000–41 (RJ assigning Doe tasks, checking in, following up on tasks, etc.).) Doe texted RJ when she was too sick to work. (ECF No. 53-8, Texts Between RJ and Doe, PgID 1002, 1006.) Once, RJ texted Doe, "it's just literally me and my dad that you would have to answer to." (*Id.* at PgID 1011.)

Doe testified that while she was working for Zaher Management at The Grand, that Rabi made several inappropriate comments to her, which made her feel uncomfortable. Specifically, she said that he would tell her that the maintenance people and tenants were coming in to "check [her] out," that he would tell her that she had nice legs but they needed a tan, that he called her "[Jane Doe] with the booty," and that he made other comments about her body pretty much every day. (ECF No. 53-2, Doe Dep., PgID 783–84.) She said that if she was alone in the office he would say "I'm going to lock the door so no one comes in and rapes you." (*Id.* at PgID 784.) Finally, she said that once, while Rabi was wearing a shirt with a topless woman on it, that he told her she needed to dress much more casually, like in shorts and a T-shirt, and that this conversation lasted for "a really long time" and was "just very weird." (*Id.*) Doe never told him that his comments made her uncomfortable because she assumed that her reactions communicated that message to him. (*Id.*) These interactions are the basis for Doe's sexual harassment claim against Rabi.

The majority of Doe's allegations of sexual harassment are against RJ. On two occasions, described below, she claims that RJ pressured her into going to the strip club Déjà Vu with him during her lunch break. She also testified that he would often sit "very, very close" to her while she was working and that, once, while he was sitting very close to her, he told her that her nose ring was "sexy" and that she should get a piercing on her lower back, touching her to indicate where he thought she

should get the piercing. (*Id.* at PgID 779, 785.) Finally, Doe testified that after the strip club incidents, a woman texted an explicit picture of herself to RJ's business phone, which he had left with Doe during his family trip to Italy, and then RJ called Doe and told her the photo was meant for her because the woman wanted to have sex with Doe while RJ was there. (*Id.* at PgID 800.)

According to Doe, after she and RJ had the conversation about piercings when he touched her lower back, RJ called her back to Joseph's office. (*Id.* at PgID 785.) At the time, RJ and Doe were the only people in the office. (*Id.*) RJ then told her about all the important people he knew, including judges and police officers in the area—he said that "if you don't do what he [RJ] says, you could be driving one day and a cop would pull you over and finds [sic] cocaine in your car, but you don't do cocaine." (*Id.*) Doe found this "very threatening." (*Id.*) At that point in the conversation, RJ began talking about how his good friend owns a strip club that he goes to for lunch and then asked Doe if she wanted to go with him sometime. (*Id.*) She said "eh." (*Id.*)

The next day, according to Doe, RJ came back to her and asked her to go with him the next Tuesday or Wednesday. (*Id.* at PgID 786.) She says that she felt "very threatened and pressured to go," and that she worried that she would lose her job if she did not go. (*Id.*) She shrugged in response, and said "I'm not sure," said that it

would be weird because RJ has a wife and kids, and said that she was his employee. (*Id*.) RJ said that it would be fine and that he would see Doe on Wednesday. (*Id*.)

That Wednesday, RJ arrived at the office earlier than normal (he usually came after lunch), asked Doe if she was ready and told her to follow him. (*Id.* at PgID 787.) RJ told Doe not to tell Joseph where they were going, and to make up a lie if Joseph ever asked. (*Id.*) They drove separately to the club, Déjà Vu in Flint, Doe following RJ. (*Id.* at PgID 789.) They went in, RJ said hello to the managers, they got soda and popcorn and sat down at a table to watch the stage. (*Id.* at PgID 790–91.) After a few minutes, maybe ten, RJ got up, asked the manager if they could have a private dance and soon they were in a private back room with a dancer named Minda, despite Doe's insistence that she did not want a lap dance or to go to a private room. (*Id.* at PgID 792.) Over the next thirty minutes in the private room, Doe alleges that RJ grabbed her hands and put them on Minda's body, who was naked except for underwear and heels, that Minda continuously unbuttoned Doe's shirt, even as Doe rebuttoned it, that Minda took Doe's bra off, that RJ and Minda pressed Doe into dancing for them, that Minda touched Doe's breast with her hands and her mouth, that RJ touched Doe's stomach, thighs, breast, and knee with his hands, and that RJ put his mouth on Doe's breast. (*Id.* at PgID 793–96.) At each step Doe tried to resist, but they "kept prodding at it" and Doe felt "mentally paralyzed." (*Id.* at PgID 794, 796.) It was "a situation where [Doe] would say no or [Doe] would say nothing and

it would happen." (*Id.* at 796.) After thirty minutes, Doe and RJ left and returned to work. (*Id.* at PgID 796–97.)

The following week, the situation repeated itself—RJ showed up at The Grand, ushered Doe out the door and to Déjà Vu. (*Id.* at PgID 797.) They arrived, they drank sodas and ate popcorn for a few minutes, then RJ insisted on a private dance with Minda. (*Id.* at PgID 798.) Once they were in the private room, Minda persistently tried to take off Doe's clothing, and this time she succeeded in getting Doe fully nude. (*Id.*) RJ and Minda touched Doe's body with their hands and mouths, and this time RJ held Doe's legs open while Minda touched Doe's vagina. (*Id.*) Again, Doe said no over and over until she "felt like [she] couldn't say no anymore." (*Id.*) At some point, RJ stepped out briefly to take a phone call, but he was otherwise in the room with Doe and Minda. (*Id.*) Afterwards, they left and returned to work in the office at The Grand. (*Id.*)

RJ testified that Doe instigated both trips to Déjà Vu. (*See* ECF No. 53-6, RJ Dep., PgID 927–31.) He says that she pressured her into taking him, that she had fun, that she took her clothes off and danced willingly, and that Doe touched RJ's leg but that he never touched her. (*Id.* at PgID 927–29.) RJ also said that the second time, when Doe was fully nude, he spent most of the time outside the booth talking to one of the bar managers. (*Id.* at PgID 929.)

Soon after the second visit to Déjà Vu, RJ left for a trip to Italy. (ECF No. 53-6, RJ Dep., PgID 921.) While he was gone, Plaintiff had his business phone and received the explicit text from RJ's friend then had the phone conversation with RJ where he said that his friend wanted to have sex with Doe described above. (*Id.* at PgID 800.) Then, before he came back, Doe was out at dinner with her parents and broke down and told them what happened. (*Id.* at PgID 783.) Doe and her parents decided that Doe should not return to work, so she did not go back to work at The Grand the next day. (*Id.*) Doe and her father ignored texts from RJ asking if she was okay and if she was coming back to work—RJ and Joseph were apparently concerned that Doe was upset because Joseph had chastised Doe for leaving the office unlocked all weekend. (*See* ECF No. 53-5, Texts Between RJ and Doe's Father, PgID 869; ECF No. 53-6, RJ Dep., PgID 924; ECF No. 53-8, Texts Between RJ and Doe, PgID 1041.) Doe never returned to work, and soon filed this suit.

### III.    STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503

F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon its mere allegations or denials in the pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote and internal quotations omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran*, 788 F.3d at 204. At the same time, the non-moving party must produce enough evidence to allow a reasonable jury to find in its favor by a preponderance of the evidence. *Anderson*, 477 U.S. at 252. "The 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology*

*Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. That party cannot meet that burden by relying solely on "[c]onclusory assertions, supported only by [his or her] own opinions," *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008), but must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004)).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed. R. Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" Ibid. It is also the basis of this court's repeated emphasis

that unauthenticated documents do not meet the requirements of Rule
56(e).

*CareSource*, 576 F.3d at 558–59 (internal citations omitted).

A court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## IV. ANALYSIS

Defendants have moved for summary judgment on all of Doe's claims except for her assault and battery, invasion of privacy, and intentional infliction of emotional distress claims against RJ. (ECF No. 42.) The Court grants summary judgment to Defendants on Doe's Title VII claim because, as Defendants correctly point out, only statutorily-defined "employers" are subject to liability under Title VII and Plaintiff has failed to establish a genuine issue of material fact that any of the defendants meet the statutory definition of employer. The Court grants summary judgment to Defendants Zaher Investment Group, LLC and Lions Gate Development, LLC because Plaintiff has not made any showing that either LLC was involved in any of the conduct alleged in her Complaint. The Court grants summary judgment to Defendants Zaher Management, LLC and The Grand Company, LLC on Plaintiff's negligent supervision, failure to train, and intentional infliction of emotional distress claims because ELCRA provides the exclusive remedy for workplace sexual harassment against the employer under Michigan law. The Court

denies summary judgment on Plaintiff's ELCRA claims against RJ, Rabi, Joseph, Zaher Management, and The Grand Company due to genuine issues of material fact.

## A. Title VII

Plaintiff brings a claim against all Defendants under Title VII, which makes it illegal for an employer to discriminate against an individual because of the individual's sex. (ECF No. 5, Amended Complaint, PgID 45–46); 42 U.S.C. § 2000e-2(a). Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). This "employee-numerosity requirement" was included by Congress in order to "spare very small businesses from Title VII liability." *Arbaugh v. Y&H Corporation*, 546 U.S. 500, 504–505 (2006). Proof that a defendant qualifies as an employer under the statutory definition is "an element of a plaintiff's claim for relief." *Id.*

An individual who does not otherwise qualify as an employer may not be held personally liable under Title VII. *Wathen v. General Electric Co.*, 115 F.3d 400, 405 (6th Cir. 1997). The phrase "any agent of such a person," as included in the definition of "employer" in Title VII, incorporates respondeat superior liability into the statute so that employers cannot escape liability by turning a blind eye to the conduct of their supervisory employees. *Id.* at 405–06. The agency provision does not make

those supervisory employees liable in their individual capacities, because it would be "inconceivable that a Congress concerned with protecting small employers would simultaneously allow civil liability to run against individual employees." *Id.* at 406 (internal quotations and citations omitted).

Plaintiff Doe brings a claim under Title VII against three individuals, RJ Zaher, Rabi Zaher, and Joseph Zaher. (ECF No. 5, Amended Complaint, PgID 45.) Plaintiff has not explained how either RJ or Joseph qualify as employers under Title VII. If Plaintiff argues that each man's supervisory role within Zaher Management or one of the other defendant LLCs qualifies him as an employer, the Court can easily reject her argument. *Wathen*, 115 F.3d at 405; *see also Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 362 (6th Cir. 2001) ("The law in this Circuit is clear that a supervisor who does not otherwise qualify as an employer cannot be held personally liable under Title VII."). If Plaintiff argues that each man, in his individual capacity, qualifies as an employer under Title VII, she must show that each man, in his individual capacity, had "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). As explained below, she has not made that showing.

Regarding Joseph Zaher's individual liability under Title VII, Plaintiff argues that he is both "an employer in his own right," and that he is "the alter ego of the corporate entities." (ECF No. 56, Response, PgID 1271.) The Sixth Circuit has not

"clearly and definitively ruled" on the issue of whether a supervisor may be held liable in his official capacity if that supervisor can be considered an alter ego of the employer, but it has noted that such a claim must be supported with evidence that the supervisor "had significant control over Plaintiff's hiring, firing, and working conditions." *Little*, 265 F.3d at 362 n.2. District Courts in this Circuit have viewed the alter ego argument with skepticism, with one finding that it is not "in line with the more reasoned interpretation of the use of the term 'agent' in the definition of employer in Title VII, i.e. that 'the obvious purpose' in including the agency provision 'was to incorporate respondeat superior liability into the statute." *Harris v. Heritage Home Health Care*, 939 F. Supp. 2d 793, 799 (E.D. Mich. 2013) (citing *Wathen*, 115 F.3d at 406). Another found that "when a corporate employer is already being sued under Title VII" adding a claim against an individual supervisor in his or her individual capacity is redundant and "adds nothing." *Pettinato v. Prof'l Parent Care*, No. 16-cv-14419, 2017 WL 2930915, at *4 (E.D. Mich. 2017) (internal quotations and citations omitted) (collecting cases).

Regardless of whether the alter ego theory is viable in this circuit, a prerequisite to that liability is that the corporate entity qualifies as an employer under Title VII. At the summary judgment stage, that requires showing that there is a genuine question of material fact as to whether the employer had "fifteen or more employees for each working day in each of twenty or more calendar weeks in the

current or preceding calendar year." 42 U.S.C. § 2000e(b); *see also Arbaugh*, 546 U.S. at 516 ("[T]he threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief.").

Whether an entity is an employer is determined at the time of the challenged conduct. *See Walters v. Metro. Educ. Enter., Inc.*, 519 U.S. 202, 205 (1997) ("Metropolitan was subject to Title VII, however, only if, at the time of the alleged retaliation, it met the statutory definition of 'employer.' "). Regarding numerosity, the plaintiff must show that the defendant had "employment relationships with 15 or more individuals for each working day in 20 or more weeks during the year in question" or the prior year. *Id.* at 212. To determine whether the defendant had employment relationships with any particular individual, a court can "look first and primarily to whether the individual in question appears on the employer's payroll," but "what is ultimately critical" is whether that person qualifies as an employee under "traditional principles of agency law." *Id.* at 211.

Traditional principles of agency law focus on the extent of control the employer exercises over the employee. *Clackamas Gastroenterology Assoc. v. Wells*, 538 U.S. 440, 448 (2003). The employer "is the person, or group of persons, who owns and manages the enterprise . . . [who] can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of the business are to be distributed." *Id.* at 450. An individual's

title is not determinative in this analysis, and neither is one single factor—whether an individual is an employee depends on "all of the incidents of the relationship." *Id.* at 450–51. Other factors that a court may consider are:

> the hiring party's right to control the manner and means by which the product is accomplished . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 352 (6th Cir. 2011) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324–24 (1992)).

Here, the Court must determine whether there is question of material fact to whether any of the defendants had fifteen or more employees for more than 20 weeks of 2018 or 2017. *Cf.* 42 U.S.C. § 2000e(b). Plaintiff urges the Court to apply the single-employer doctrine to find that Joseph Zaher and all of the family LLCs are a single employer, allowing the Court to aggregate their employees for the numerosity analysis. (ECF No. 56, Response, PgID 1272–74); *see Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997) ("[T]wo companies may be considered so interrelated that they constitute a single employer.") The following analysis assumes but does not decide that single employer doctrine applies here in order to determine whether application of that doctrine saves Plaintiff's claim.

26

First, Plaintiff's attempt to count Raymond, Dawn, and the person or persons who filled Plaintiff's role after she left as four separate employees is contrary to the statutory requirement that the fifteen people be employed on "each working day in *each of twenty or more calendar weeks* in the current or preceding calendar year." 42 U.S.C. § 2000e(b) (emphasis added); *cf. Walters*, 519 U.S. at 211 ("[An individual] is counted as an employee for each working day after arrival and before departure.") It is undisputed that Plaintiff was the only person working in her position during the time she was employed by Zaher Management. Doe's declaration that the woman the Zahers hired to replace her "frequently came into the office to discuss the fact that she would assume my [Doe's] job" does not come close to establishing a genuine issue of material fact as to whether her replacement was in an employment relationship with Zaher Management before Doe left. (ECF No. 53-18, Doe Aff., PgID 1228); *contra Equal Emp't Opportunity Comm'n v. First Catholic Slovak Ladies Ass'n*, 694 F.2d 1068, 1070 (6th Cir. 1982). (highlighting multiple indicia of employment). Further, Raymond and Dawn were hired in either December of 2018 or January of 2019, so there is no possible way that they worked the twenty weeks in 2018 or 2017 required to independently count toward the fifteen employee threshold. (ECF No. 53-12, Rabi Dep., PgID 1124; ECF No. 53-7, Joseph Dep., PgID 978–79; ECF No. 53-6, RJ Dep., PgID 926.) Because Plaintiff, her

replacement, and Raymond (who replaced the replacement) worked successive weeks, together they count as a single employee toward the threshold.

Second, according to Joseph's representation, Zaher Management had four people on its payroll at the time of the challenged conduct—Joseph, Rabi, Rosan (RJ's wife), and Doe. (ECF No. 57-1, Joseph Aff., PgID 1296.) Of those four, Joseph, Rabi, and Doe were undisputedly employees. There is no evidence that suggests that Zaher Management or any of the other family LLCs had an employment relationship with Rosan, but her presence on the payroll of Zaher Management suggests that she is an employee, which is sufficient at the summary judgment stage. *Cf. Walters*, 519 U.S at 211–12 (approving of employment analysis that looks first and primarily to presence of an individual on the payroll as proof of status). This brings the total to four employees.

Plaintiff urges the Court to find issues of material fact as to whether Odette (Joseph's wife), RJ, Brian (maintenance), Tony (painter), a four-person maintenance team, and two janitors were employees of Zaher Management or another defendant LLC. (ECF No. 56, Response, PgID 1275.) Although there is next-to-no evidence that Odette was an employee during the relevant period, and very little evidence regarding the employment relationship between the Zaher family business and Brian, Tony, the maintenance team (which may or may not include Brian), and the janitors, the Court must view the facts in the light most favorable to Plaintiff at the

summary judgment stage. So, assuming that Zaher Management or one of the other Zaher family LLCs had the right to control the manner and means of each of the listed people, there were a total of 14 employees in 2018. Therefore Zaher Management and the other Zaher family LLCs, even if aggregated into a single entity, were not "employers" under Title VII. Plaintiffs has not established a genuine issue of fact on employee-numerosity and Defendants are entitled to summary judgment on the Title VII claim.

## B.    Elliot-Larsen Civil Rights Act

In addition to her Title VII claim, Plaintiff brings a claim against all Defendants of sexual harassment and hostile work environment discrimination under the parallel Michigan statute, ELCRA, which also prohibits employers from discriminating based on sex. Mich. Comp. L. § 37.2202(1)(a). ELCRA makes clear that "[d]iscrimination because of sex includes sexual harassment" which means "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature" when submission to the conduct or communication is a term or condition of employment, substantially interferes with employment or has the purpose or effect of creating "an intimidating, hostile, or offensive employment . . . environment." Mich. Comp. L. § 37.2103(i). Under ELCRA, an "employer" is "a person who has 1 or more employees, and includes an agent of that person." Mich. Comp. L. § 37.2201(a). The Michigan

Supreme Court has held that the agency language in the definition, unlike the similar language in Title VII, creates individual liability for agents of employers when the agents are the sexual harassers. *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 421 (2005).

To establish a prima facie claim of hostile work environment, a person must establish:

> (1) that she belonged to a protected group; (2) that she was subjected to communication or conduct on the basis of sex; (3) that she was subjected to unwelcome sexual conduct or communication; (4) that the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with her employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

*Elezovic v. Bennett*, 274 Mich. App. 1, 7 (2007) (citing *Radtke v. Everett*, 442 Mich. 368, 382–83 (1993). "Respondeat superior liability exists when an employer has adequate notice of the harassment and fails to take appropriate corrective action. *Id.* (citing *Chambers v. Trettco, Inc.*, 463 Mich. 297, 318–19 (2000). "[I]f an *employer* is accused of sexual harassment, then the respondeat superior inquiry is unnecessary because holding an employer liable for personal actions is not unfair." *Radtke*, 442 Mich. at 396. For a claim of quid pro sexual harassment, which encompasses both submission to conduct or communication as a term or condition of employment and substantial interference with employment, a plaintiff must demonstrate that "(1) he or she was subjected to unwelcome sexual conduct or communications as described

in the statute, and (2) that the employer or the employer's agent used submission to or rejection of the proscribed conduct as a factor in a decision affecting employment." *Rymal v. Baergen*, 262 Mich. App. 274, 311 (2004) (citing *Chambers*, 463 Mich. at 310)). Here, Plaintiff advances both theories under ELCRA.

Defendants make four arguments on the ELCRA claim: (1) that Defendants The Grand Company, LLC, Lions Gate Development, LLC, and Zaher Investment Group, LLC are not employers because they do not have any employees, (2) that Rabi and RJ are not agents of Zaher Management because neither had control over the terms of Doe's employment such as promotions, bonuses, overtime options, raises, shift and job assignments, and terminations, (3) that Rabi's alleged conduct does not constitute sexual harassment as a matter of law because his comments were neither sexual nor offensive and were not so severe or pervasive that they altered the conditions of Doe's employment, and (4) that both Joseph and Zaher Management had no notice that Doe was being harassed because she did not report anything about RJ or Rabi to Joseph and because the harassment was not so pervasive that Joseph should have known about it. (ECF No. 42, Motion for Summary Judgment, PgID 466–74.) These arguments, as discussed below, are unavailing. The Court denies the remaining Defendants' Motion on the ELCRA claim.

### 1. The Grand Company, LLC is an Employer

Because the Court grants summary judgment to Defendants Lions Gate Development, LLC and Zaher Investment Group, LLC, the only question related to Defendants' first argument is whether The Grand Company, LLC is an employer subject to ELCRA.[5] The Court finds that there is a genuine issue of material fact regarding the question of whether The Grand Company had one or more employees and therefore whether it is subject to ELCRA. *See* Mich. Comp. L. § 37.2201(a). ELCRA does not define the term "employee," but Michigan courts have found that, where undefined, the plain meaning of the word "employee" is "a person who has been hired to work for another." *Rakowski v. Sarb*, 269 Mich. App. 619, 626 (2006). In the alternative, Michigan courts apply the economic-realities test to consider the totality of the circumstances to determine whether a person was an employee or independent contractor. *Id.* at 625–26. The economic-realities test considers four factors, (1) control over the worker's duties; (2) payment of wages; (3) the right to hire, fire, and discipline; and (4) the importance of the duties to the employer's business, as well as any other relevant circumstances. *Id.* at 625.

---

[5] Defendants do not contest the fact that Joseph, individually, is an employer. Individuals who own the corporation or corporations that employ the alleged harassment victim and who have the authority to hire, fire, and control the working conditions of the victim qualify as employers for ELCRA respondeat superior liability purposes. *See Harris*, 939 F. Supp. 2d at 801–02 (citing *Radtke*, 442 Mich. at 399 in support of this proposition).

Under either the plain meaning of the word employee or the economic-realities test, there is a genuine issue of material fact as to whether The Grand Company, LLC employed Plaintiff Doe, as well as Zaher Management's other employees. Although Joseph and RJ testified that The Grand Company, LLC exists only to hold the title to The Grand and that it does not even have a checking account, much of Doe's work and that of Zaher Management's other employees was done to benefit The Grand Company. (ECF No. 53-7, Joseph Dep., PgID 958; ECF No. 53-6, RJ Dep., PgID 888.) Further, The Grand Company is not an unrelated, absentee landlord that hired a management company to protect and develop its investment, but an entity controlled by the exact same people who control Zaher Management. When Joseph or RJ Zaher exercised control over Doe's work, which was important to the goal of making The Grand Company's holding, The Grand apartment building, profitable, there was no way to distinguish whether they were acting on behalf of Zaher Management or The Grand Company. Therefore there is a genuine issue of material fact as to whether Doe and Zaher Management's other employees were simultaneously employed by The Grand Company and Zaher Management—functionally indistinguishable entities. *Compare Swallows*, 128 F.3d at 993–94 ("[T]wo companies may be considered so interrelated that they constitute a single employer."). A jury could reasonably conclude that The Grand Company had at least

one employee and therefore that it is an employer under ELCRA and the Court will not grant it summary judgment on this basis.

## 2. RJ and Rabi were Agents

Defendants' second argument presents the question of whether RJ or Rabi were agents of Zaher Management and/or The Grand Company subject to ELCRA liability. Under ELCRA, "persons to whom an employing entity delegates supervisory power and authority to act on its behalf are 'agents,' as distinguished from coemployees, subordinates, or coworkers who do not have supervisory powers or authority," are agents subject to ELCRA liability. *Bennett*, 274 Mich. App. at 10. "[I]t is not necessary for a plaintiff to establish that a defendant was 'functioning as an agent' when he committed the charged specific acts of sexual harassment charged." *Id.* at 11. Agents of an employer are held to the same standard as the employer under ELCRA because when an employer's agent, who has control over the employee's "employment circumstances and opportunities like promotions, bonuses, overtime options, raises, shift and job assignments, and terminations," sexually harasses an employee, the employee is placed in the same "no-win situation of either risking her livelihood by reacting to or reporting the unlawful behavior or accepting the harassment." *Id.* at 12.

There is a genuine issue of material fact as to whether RJ was an agent of Zaher Management and/or The Grand Company. It is disputed, but, viewed in the

light most favorable to Doe, the facts show that RJ hired her without consulting Joseph. (*Compare* ECF No. 53-2, Doe Dep., PgID 776, 799; ECF No. 53-7, Joseph Dep., PgID 978.) In addition to the ability to authority to hire employees like Doe, RJ had the authority to give Doe most of her day-to-day tasks and instructions, (ECF No. 53-6, RJ Dep., PgID 893, 896–99; ECF No. 53-2, Doe Dep., PgID 777; *see also* ECF No. 53-8, Texts Between RJ and Doe, PgID 1000–41 (RJ assigning Doe tasks, checking in, following up on tasks, etc.)), the authority to approve Doe's sick days, (ECF No. 53-8, Texts Between RJ and Doe, PgID 1002, 1006), and, according to RJ, he was one of the only people that Doe "would have to answer to" (*Id.* at PgID 1011). RJ even had the authority to call Rabi and assign him tasks at one of the family's various properties. (ECF No. 53-12, Rabi Dep., PgID 1125–26.) RJ was so involved in the business of Zaher Management and/or The Grand Company that Doe thought he owned it. (ECF No. 53-2, Doe Dep., PgID 776.) He had one of only three keys to the Zaher Management headquarters, where he kept a personal office. (ECF No. 53-6, RJ Dep., PgID 902; ECF No. 53-2, Doe Dep., PgID 777.) He went there almost every day for an hour or so, and kept a business phone on his person. (ECF No. 53–6, RJ Dep., PgID 895.) Doe testified that, whenever RJ and Joseph were arguing about the companies, RJ would "always interject and say this is my business." (ECF No. 53-2, Doe Dep., PgID 777.) Under these facts, a jury could easily infer that Joseph, who was at the offices every day and who was ostensibly in

control of the companies, was aware of RJ's representation of himself as Doe's supervisor and that he condoned that representation. So, because there is no evidence indicates that Joseph ever told RJ to stop directing Doe's work or assigning her tasks and no evidence that Joseph ever told Doe that RJ did not have the authority to tell her what to do, a jury could find that Joseph had granted RJ supervisory authority over Doe's employment. There is a dispute over the degree of control RJ had over the companies and Doe, which means that there is a dispute over whether RJ was an agent of Doe's employers under ELCRA.

There is also a genuine dispute as to whether Rabi was an agent of Doe's employer's under ELCRA. Rabi trained Doe on the computer program used at the office as well as on how to show units and speak on the phone with current and potential customers. (ECF No. 53-7, Joseph Dep., PgID 979; ECF No. 53-2, Doe Dep., PgID 776–77.) He told her to dress more casually for work. (ECF No. 53-2, Doe Dep., PgID 784; ECF No. 53-12, Rabi Dep., PgID 1134–35.) Doe testified that Rabi also referred to the companies as "my business" and that she believed him to be a co-owner or manager. (ECF No. 53-2, Doe Dep., PgID 777.) Rabi also controls one of the web of LLCs that the Zaher family uses to formally divide its construction and management activities, though, in reality there is no distinction—Rabi's LLC relies on personal loans from Joseph and builds on land owned by Joseph or one of the LLCs. (ECF No. 53-12, Rabi Dep., PgID 1111, 1120–21.) Based on these facts,

a jury could credit Doe's belief that Rabi had supervisory authority over her because he was an equal partner in the family business for which Doe was hired. There is a genuine dispute of material fact as to whether Rabi was an agent of Zaher Management and/or The Grand Company.

### 3. Rabi's Alleged Conduct Constitutes Sexual Harassment

Defendants' third argument asks whether Rabi's conduct, as alleged by Doe, was sexual harassment as a matter of law. Defendants do not contest that Doe's allegations against RJ[6] constitute sexual harassment, but argue, based on the third and fourth elements of a prima facie case for hostile workplace discrimination, that Rabi's conduct or communication toward Doe was not sexual in nature, and that even if it was, it did not "substantially interfere with her employment or create[] an intimidating, hostile, or offensive work environment." *See Bennett*, 274 Mich. App. at 7 (citing *Radtke*, 442 Mich. at 382–83). The Court finds genuine issues of material fact on both of these elements.

---

[6] These include the two trips to the strip club as well as Doe's testimony that RJ would often sit "very, very close" to her while she was working, that, once, while he was sitting very close to her, he told her that her nose ring was "sexy" and that she should get a piercing on her lower back, touching her to indicate where he thought she should get the piercing, and that, after the trips to the strip club, a woman texted an explicit picture of herself to RJ's business phone, which he had left with Doe during his family trip to Italy, and then RJ called Doe and told her the photo was meant for her because the woman wanted to have sex with Doe while RJ was in the room. (ECF No. 53-2, Doe Dep., PgID 779, 785, 800.)

In order to state a prima facie case for sexual harassment under ELCRA, the alleged unwelcome conduct and communication must be "sexual in nature," not just gender-based. *Haynie v. State*, 468 Mich. 302, 304 (2003). Courts considering whether comments are sexual in nature have found that comments that a plaintiff's male coworkers spoke to her because they wanted to have sex with her, that plaintiff looked "so hot today" and was making the speaker "horny," as well as accusations that the plaintiff was having sex with customers to get business and that she was spending her lunch having sex with various men were communications that were sexual in nature. *Marotta v. Ford Motor Co.*, 119 F. Supp. 3d 676, 692 (E.D. Mich. 2015); *Rymal*, 262 Mich. App. at 313.

The plaintiff must also establish a genuine issue of material fact that the unwelcome sexual conduct or communication created an atmosphere that a reasonable person would find "so infused with hostility" as to alter the conditions of employment. *See Radtke*, 442 Mich. 368, 385–87 (establishing reasonable person standard). This determination is "not subject to a mathematical formula," and courts must look to the cumulative effect of the conduct "through a totality-of-the-circumstances approach." *Marotta*, 119 F. Supp. 3d at 690 (analyzing hostile work environment under both Title VII and ELCRA). Courts should consider factors such as the frequency and severity of the conduct, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with the

employee's work performance. *Id.* Courts may also consider the relative size or intimacy of the workspace, as well as other factors that may impact the influence of the conduct on the environment. *See Radtke*, 442 Mich. 372. Accordingly, "although a single incident of sexual harassment is generally insufficient to constitute a hostile work environment, a single incident may be sufficient if severe harassment is perpetrated by an employer in a closely knit working environment." *Id.*; *see also Rymal*, 262 Mich. App. at 262 (finding a genuine issue of material fact on hostile environment sexual harassment when employer in two person venture subjected employee to numerous comments "of a sexual nature and that questioned her sexual activities").

In *Marotta*, the court found a genuine issue of material fact on this question when one of plaintiff's supervisor made comments to her such as (1) her male coworkers spoke to her because they wanted to have sex with her, (2) she looked "so hot today" and was making him "f---'n horny," and (3) "so, is this how you like your men, black, huh?" and intentionally touched her backside on four-to-six occasions, and when one of plaintiff's other supervisors made various comments to her co-workers about wanting to have sex with her and asked her to hug him. 119 F. Supp. 3d at 683–84. The court found genuine issues of material fact because the conduct involved harassing comments as well as physical invasion by one of the supervisors, and because "the conduct and comments were ongoing and continuous." *Id.* at 692.

Here, Doe's testimony regarding Rabi's behavior toward her presents genuine issues of material fact regarding the sexual nature of the comments and whether, in the totality of the circumstances, a reasonable person would find the working environment "so infused with hostility" as to alter the conditions of employment. *See Radtke*, 442 Mich. 368, 385–87. Doe testified that Rabi would tell her that the maintenance people and tenants were coming in to "check [her] out," that he would tell her that she had nice legs but they needed a tan, that he called her "[Jane Doe] with the booty," and that he made other comments about her body pretty much every day. (ECF No. 53-2, Doe Dep., PgID 783–84.) She said that if she was alone in the office he would say "I'm going to lock the door so no one comes in and rapes you." (*Id.* at PgID 784.) She also said that Rabi, while wearing a shirt with a topless woman on it, initiated a "really long," "very weird" conversation where he told her she needed to dress much more casually, like in shorts and a T-shirt. (*Id.*)

The comments about her body, about people coming in to check her out, and his nickname for her that referenced an often sexualized body part, and his explicit reference to the threat of someone raping her are clearly sexual in nature. In fact, Rabi's comments about locking the door so that no one would come in and rape Doe and about customers and maintenance people checking Doe out are very similar to the comments in *Marotta* that the Court found to be sexual in nature, such as the

40

comments that the plaintiff's male coworkers spoke to her because they wanted to have sex with her. 119 F. Supp. 3d at 683–84.

Rabi's conduct, when considered in the totality of the circumstances, contributed to a working environment that a reasonable person would find hostile. First, Rabi's actions cannot be isolated from RJ's actions in this analysis—"courts look to the cumulative effect of the alleged harassment." *Marotta*, 119 F. Supp. 3d at 690. Second, the fact that it was a close-knit working environment—Joseph and Doe were always present, RJ came in for a few hours every day, and Rabi came in frequently, especially when Doe first started at the job—is a relevant circumstance. *See Radtke*, 442 Mich. 372. So, in this close-knit working environment where two out of the three family members who held themselves out as controlling the business were regularly commenting on Doe's body, making sexualized comments directly to her, or sitting "very, very close" to her, a reasonable person could find the conduct intimidating and believe that she had to endure the conduct or leave the job. (ECF No. 53-2, Doe Dep., PgID 779, 783–84); *see Rymal*, 262 Mich. App. at 281–82, 313 (finding that supervisor's numerous comments of a sexual nature and accusations about plaintiff's sexual activities were a basis for sexual harassment hostile environment claim, in addition to a basis of abusive behavior after plaintiff turned down supervisor's sexual advance). There is a genuine issue of material fact as to

whether Rabi's conduct so contributed to the hostile environment that he can be held personally liable under ELCRA.

Defendants analogize this case to *Morris v. Oldham Cty. Fiscal Court*, where the plaintiff's supervisor (1) told several dirty jokes in her presence, though the jokes were not directed at her, (2) once implied that he would give her a better job evaluation if she gave him sexual favors, (3) once called her "Hot Lips," and (4) occasionally commented about her state of dress. 201 F.3d 784, 790 (6th Cir. 2000). There, the Sixth Circuit, applying Title VII and Kentucky's civil rights law which "generally tracks the language of Title VII and, thus, 'should be interpreted consonant with federal interpretation,' " found that the supervisor's actions were "simple teasing, offhand comments, and isolated incidents" and not discriminatory changes in the terms and conditions of the plaintiff's employment. *Id.* at 790, 793.

*Morris* is distinguishable on the facts and the law. First, Doe's hostile work environment claim against Rabi is under ELCRA, which differs from Title VII because it has express language prohibiting sexual harassment. *See Chambers*, 463 Mich. at 315. The Michigan Supreme Court has made it clear that courts applying Michigan law are "not compelled to follow . . . federal interpretations" when deciding ELCRA claims. *Id.* at 314; *see also Elezovic*, 472 Mich. at 424 ("[W]hile federal courts have the power to construe Title VII as they will, that does not compel us to follow them."). Second, the *Morris* court highlighted that the dirty jokes were

not directed at the plaintiff and the comments directed toward her were isolated when it found that they did not create an objectively hostile environment. 201 F.3d at 790. In contrast, Doe testified that Rabi commented directly to her about her body or other people coming to look at her in a sexual way "pretty much every day." (ECF No. 53-2, Doe Dep., PgID 784.) These were not isolated incidents—they were regular parts of Doe's working environment. Defendants' reliance on *Morris* is misplaced, and the Court denies Rabi summary judgment on Doe's ELCRA claim against him.

### 4. Joseph, Zaher Management, and The Grand Company had Sufficient Notice

Defendants' final argument presents the question of whether Zaher Management, The Grand Company, and Joseph had sufficient notice to be liable under the respondeat superior element of an ELCRA claim. As stated above, the fifth element of an ELCRA claim against an employer is respondeat superior, which "exists when an employer has adequate notice of the harassment and fails to take appropriate corrective action." *Bennett*, 274 Mich. App. at 7 (2007) (citing *Radtke*, 442 Mich. at 382–83 and *Chambers*, 463 Mich. at 318–19). A plaintiff needs to prove this element only when the employer is not the person accused of sexual harassment, "if an *employer* is accused of sexual harassment, then the respondeat superior inquiry is unnecessary because holding an employer liable for personal actions is not unfair." *Radtke*, 442 Mich. at 396. When a plaintiff seeks to hold an

individual owner of a defendant corporation liable under ELCRA through respondeat superior liability, the plaintiff must show that the individual had notice and failed to take prompt remedial action. *See Harris*, 939 F. Supp. 2d 801–02.

A plaintiff can show notice through proof of actual notice or constructive notice. *Chambers*, 463 Mich. at 319. Actual notice can be shown by proof that plaintiff complained about the harassment to "higher management," which is "someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." *Sheridan v. Forest Hills Public Schools*, 247 Mich. App. 611, 622 (2001). Of course, if the harasser is "higher management," knowledge of the harassment can be imputed to the employer corporation under the fairness rationale of *Radtke*. 442 Mich. at 396. Constructive notice exists when "by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Chambers*, 463 Mich. at 319. In *Sheridan*, there was no constructive notice when plaintiff was harassed on four occasions over a three-year period, when plaintiff made only generalized complaints, and when plaintiff told an inquiring manager that it was "none of their business." 247 Mich. App. at 617, 627.

Here, there is no question that no corrective action was taken—the only question is whether the LLCs and Joseph had notice of the harassment of Doe. As

44

explained above, there is a genuine dispute of material fact as to whether both Rabi and RJ had control over hiring and personnel decisions, which means that a reasonable jury could find that they were "higher management" in both Zaher Management and The Grand Company under *Sheridan*. 247 Mich. App. at 622. As the alleged harassers, their knowledge of their own actions can be fairly imputed to the LLCs under *Radtke*. 442 Mich. at 396. Thus, Zaher Management and The Grand Company had sufficient notice to be liable under ELCRA. There is also a genuine dispute of material fact as to whether Joseph had constructive notice of RJ and Rabi's behavior toward Doe. As described above, Rabi's comments to Doe occurred regularly—on almost every day that he came into the office. (ECF No. 53-2, Doe Dep., PgID 784.) Doe said the RJ frequently sat "very, very close" to her while she was working in a way that was "very weird." (*Id.* at PgID 785.) These near-daily incidents are easily distinguishable from the isolated incidents of harassment in *Sheridan*. 247 Mich. App. at 627. Further, Doe testified that Joseph "knew everything going on" with the business and the buildings. (*Id.* at PgID 777.) Based on these allegations, a jury could believe that the sexually hostile atmosphere at The Grand was so pervasive that a reasonable employer would know that sexual harassment was occurring. Therefore, there is a genuine issue of material fact as to whether Joseph had notice of the sexual harassment and failed to take corrective measures. The Court denies summary judgment on Count II of Doe's Complaint.

### C. Intentional Infliction of Emotional Distress, Negligent Supervision, and Negligent Failure to Train Against The Grand Company and Zaher Management

Plaintiff also brings claims of intentional infliction of emotional distress, negligent supervision, and negligent failure to train under Michigan common law against The Grand Company and Zaher Management. (ECF No. 5, Amended Complaint, PgID 51–54, 58–60.) Defendants move to dismiss these claims because, on the negligence claims, they disclaim owing Doe a duty of care and, on the intentional infliction of emotional distress claims, they argue that employers are generally not liable for the intentional torts of their employees unless the employer knew or should have known of the employee's propensities, and they were unaware of RJ's propensity toward taking young girls to strip clubs. (ECF No. 42, Motion for Summary Judgment, PgID 475–77.) They also argue that RJ was outside the scope of his alleged employment when he was at the strip club with Doe, which also precludes vicarious liability for RJ's intentional tort. (*Id.*) The Court grants summary judgment on these claims, but for a separate reason—in Michigan, ELCRA "provides the exclusive remedy for a claim based on sexual harassment" in the workplace when the victim is seeking redress from the harasser's employer. *McClements v. Ford Motor Co.*, 473 Mich. 373, 383 (2005); *see also Bennett*, 274 Mich. App. at 6.

In *McClements*, a cashier employed by a food services company to work in the cafeteria at a Ford assembly plant who had been sexually harassed by a Ford employee sued Ford under ELCRA and for negligent retention of that employee. 473 Mich. at 376–79. Regarding the negligent retention claim, the Michigan Supreme Court noted the general rule that "an employer is not responsible for an intentional tort in the workplace committed by its employee acting outside the scope of employment" as well as the exception for employers who knew of the employee's propensity to commit that type of intentional tort. *Id.* at 381. The *McClements* court then distinguished the exception as involving underlying conduct that "comprised the common-law tort of assault" and found that McClements could not take advantage of that exception because her negligent retention claim was premised on "the *statutorily based* tort of sexual harassment." *Id.* at 382. The court held that negligent retention claims could only be premised on tort claims "that existed before passage of civil rights legislation," even where the claim premised on sexual harassment may implicate torts like assault and battery. *Id.* at 383 n.8.

Plaintiff's negligent supervision and negligent failure to train claims are clearly premised on the failure of Zaher Management and The Grand Company to prevent RJ's sexual harassment of Doe. (*See* ECF No. 5, Amended Complaint, PgID 51–54.) Although Doe also brings common-law tort claims of assault and battery, as well as invasion of privacy and intentional infliction of emotional distress claims

against RJ, the negligent supervision and failure to train claims are premised on their failure to supervise RJ to prevent the sexual abuse of employees and the failure to take reasonable protective measures to protect Plaintiff from the risk of sexual abuse by RJ. (*Id.*) So, like the negligent retention claim in *McClements*, Doe's negligent supervision and failure to train claims, though they implicate common-law torts, are premised on the statutory tort of workplace sexual harassment, which means that ELCRA provides the exclusive remedy. 473 Mich. at 382–83. Therefore, the Court grants summary judgment in favor of Zaher Management and The Grand Company on Counts V and VI of Doe's Complaint.

Although Doe's claim of intentional infliction of emotional distress against Zaher Management and The Grand Company differs from the negligent supervision and failure to train claims because it is premised on respondeat superior liability rather than direct liability, the same analysis under *McClements* applies. *See Mueller v. Brannigan Bros. Rests. and Taverns, LLC*, 323 Mich. App. 566, 574 (2018) (finding that the tort of negligent hiring or negligent retention is "not a tort dependent on vicarious liability at all, but rather direct liability). The essential holding in *McClements* is that ELCRA provides the exclusive means for holding an employer liable for workplace sexual harassment, whether through a direct liability theory such as negligent retention or through a respondeat superior theory such as intentional infliction of emotional distress. *Cf.* 473 Mich. at 382 ("Plaintiff's remedy,

then, for any act of sexual harassment is limited to those provided by the CRA."). Doe's intentional infliction of emotional distress claim, like her negligent supervision and failure to train claims, is clearly premised on the employers' failure to prevent workplace sexual harassment. (*See, e.g.*, ECF No. 5, Amended Complaint, PgID 58 ("A reasonable person would not expect Defendants The Grand Co., and Zaher Management to tolerate or permit their employee or agent to carry out sexual assault, abuse, or molestation after they knew or should have known that Defendant RJ Zaher was sexually harassing Plaintiff on the job.").) In fact, the cases Doe relies upon to argue that employers can be vicariously liable for the sexual harassment of their employees all find vicarious liability within the context of Title VII, the federal equivalent of ELCRA, sexual harassment claim—not for a separate common-law tort. *See Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 184 (6th Cir. 1992); *Yates v. Avco Corp.*, 819 F.2d 630, 636 (6th Cir. 1987); *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742, 756 (1998). Doe's exclusive remedy against Zaher Management and The Grand Company, under Michigan law, is an action under ELCRA. Accordingly, the Court grants summary judgment in favor of Zaher Management and The Grand Company on Count IX of Doe's Complaint.

## V.     CONCLUSION

For those reasons, the Court GRANTS summary judgment on Plaintiff's Title VII claim against all defendants (Count I), on Plaintiff's negligent supervision,

negligent failure to train and intentional infliction of emotional distress claims against Zaher Management and The Grand Company (Counts V, VI, and IX in part), and on Plaintiff's ECLRA claim against Zaher Investment Group, LLC and Lions Gate Development, LLC (Count II in part). The Court DENIES Defendants' Motion for Summary Judgment on Plaintiff's ELCRA claim against RJ, Rabi, Joseph, Zaher Management, and The Grand Company (Count II in part).

IT IS SO ORDERED.

Dated: February 18, 2020

s/Paul D. Borman
Paul D. Borman
United States District Judge